# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **NARRELL CHRISTOPHER PIERCE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:19-cv-00352** |
| | ) | |
| **CHANCE LEEDS, Warden,**[1] | ) | **JUDGE CAMPBELL** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Petitioner Narrell Pierce, a state inmate proceeding pro se, has filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. No. 1), challenging the legality of his 2013 conviction in Davidson County Criminal Court. Respondent has filed the record of proceedings in state court (Doc. Nos. 13, 14) and an Answer to the Petition (Doc. No. 15). Petitioner has filed a brief in reply to Respondent's Answer. (Doc. No. 23.)

This matter is ripe for the Court's review. Respondent does not dispute that the Petition in this case is timely, that this is Petitioner's first Section 2254 petition related to this judgment of conviction, and that he does not have any available state remedies left to pursue. (Doc. No. 15 at 2.) Having reviewed Petitioner's arguments and the underlying record, the Court finds that an evidentiary hearing is not required. As explained below, Petitioner is not entitled to relief under Section 2254, and his Petition will therefore be denied by Order entered contemporaneously with this Memorandum Opinion.

---

[1] The proper respondent to a habeas petition filed under 28 U.S.C. § 2254 is "the person who has custody over" the petitioner. 28 U.S.C. § 2242; *Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004). Following Petitioner's transfer to the Whiteville Correctional Facility (*see* Doc. No. 20), his custodian is Chance Leeds, the Warden of that facility. The Clerk must therefore amend the docket in this case to reflect Warden Leeds as Respondent.

# I. PROCEDURAL HISTORY

In 2013, Petitioner was tried and convicted on charges of attempted aggravated robbery; attempted second-degree murder (as a lesser-included offense of attempted first-degree murder); employment of a firearm during the commission of or attempt to commit a dangerous felony; and unlawful possession of a handgun by a felon. (Doc. No. 13-11 at 148–49.) He received a total effective sentence of 51 years in prison. (Doc. No. 13-1 at 213–16.) Petitioner filed a motion for new trial, which was heard and denied by the trial court. (Doc. No. 13-15.)

The Tennessee Court of Criminal Appeals (TCCA) affirmed Petitioner's conviction and sentence on direct appeal. *State v. Pierce*, No. M2014-00120-CCA-R3-CD, 2015 WL 2102003 (Tenn. Crim. App. May 5, 2015). Petitioner's application for permission to appeal to the Tennessee Supreme Court was denied. (Doc. No. 13-22.) Petitioner then returned to the trial court and filed a timely pro se petition for post-conviction relief, which was amended after counsel was appointed. (Doc. No. 13-23 at 64–69.) After holding an evidentiary hearing (Doc. No. 13-24), the court denied post-conviction relief. (Doc. No. 13-23 at 71–76.)

Petitioner's post-conviction appeal was denied by the TCCA, *Pierce v. State*, No. M2017-01268-CCA-R3-PC, 2018 WL 5793575 (Tenn. Crim. App. Nov. 5, 2018), and his application for permission to appeal to the Tennessee Supreme Court was also denied. (Doc. No. 13-32.) Petitioner then timely filed the instant action under Section 2254.

# II. FACTS

The TCCA summarized the facts of this case in its opinion on direct appeal, which it then drew from substantially in restating the facts on post-conviction appeal. The TCCA noted that, in addition to the evidence admitted at trial, the record of trial-court proceedings included evidence from two pretrial hearings on Petitioner's motions to suppress (1) his identification by the victim

2

from a photographic lineup, and (2) evidence obtained in the course of Petitioner's arrest and the execution of a search warrant against him. The TCCA's summary of the facts from Petitioner's pretrial, trial, and post-conviction proceedings is set out below. First, with regard to pretrial and trial proceedings:

> At the suppression hearings, . . . Anthony Wilfert testified that in March 2011, he was a detective with the Metropolitan Nashville Police Department ("NPD"). On March 15, 2011, he responded to a report of a robbery and shootout at the Lewis Street Market. Detective Wilfert met with the victim, Kamil Alakabi, who described the two suspects as African American males. Detective Wilfert also viewed the Lewis Street Market's surveillance video and located shell casings throughout the building.
>
> During his investigation, Detective Wilfert developed the [Petitioner] as a possible suspect and compiled a photographic lineup that included the [Petitioner]. . . . The victim looked at the lineup for several minutes, . . . then identified photograph number 3, which depicted the [Petitioner], and stated, "Number 3 looks like him; all others don't resemble him." Detective Wilfert told the victim that he needed to be "100 percent sure" that he identified the correct person, and the victim responded, "That's him, none of the others were him."
>       . . . .
>
> Kamil Alakabi, the owner and operator of Lewis Street Market, testified that on March 15, 2011, two men attempted to rob his store at gunpoint. The victim recalled that at approximately 9:00 p.m. that evening, he was organizing the shelves in his store with one of his employees when two men, later determined to be the [Petitioner] and Travis Bowman, entered the store. They walked directly towards the victim, and the [Petitioner] put a gun in his face. The victim grabbed the gun, and the [Petitioner] punched him and knocked him to the ground. The two men then approached the other employee, and the victim retrieved his own gun. The [Petitioner] fired several shots at the victim, and the victim returned fire. The two men then ran out of the store and fled the scene. The victim immediately called the police to report the incident. He described the suspects and viewed the surveillance video with the responding officers.
>
> The victim recalled being shown a photographic lineup by police and identifying the [Petitioner] as the gunman. He said that he told Detective Wilfert that he was "50 percent sure that's him." . . . The victim attended a subsequent court hearing and identified the [Petitioner] as the man who shot at him and attempted to rob him. He again identified the [Petitioner] as the perpetrator during the suppression hearing.

On cross-examination, the victim agreed that he had never seen the [Petitioner] prior to the robbery. He also agreed that the gunman wore sunglasses and a hat, making it harder to see him, and that the gunman pulled out his gun very quickly and surprised the victim. He recalled that the entire incident happened very quickly and was over within one or two minutes. The victim reiterated that he told Detective Wilfert he was "50 percent certain" that the photograph he selected depicted the gunman. He agreed that seeing the surveillance video and subsequent photographs made him more certain that he had selected the man who shot at him.

    . . . .

The victim's testimony at trial was largely consistent with his testimony at the suppression hearing. He clarified that after being knocked to the ground by the [Petitioner], the [Petitioner] and Mr. Bowman approached the victim's employee and held a gun to his face. While the perpetrators focused their attention on the other employee, the victim retrieved a nine millimeter handgun from his pocket. Before he could fire any shots, however, the magazine fell out of his gun, and the [Petitioner] began firing his own weapon at the victim. The victim retrieved the magazine and returned fire. The [Petitioner] then continued to shoot at the victim while he and Mr. Bowman fled the store. After the perpetrators fled the store, the victim called 911. Police responded to the scene, interviewed the victim, and collected evidence at the store. During their investigation of the scene, officers collected one 40-caliber cartridge case. Two more 40-caliber shells were later discovered by the victim and collected by NPD officers. The victim also provided police with the surveillance video that captured the incident and turned over his gun for analysis. Several days after the shooting, the victim identified the [Petitioner] in a photographic lineup as the gunman who attempted to rob his store.

Detective Wilfert's testimony was likewise consistent with his testimony at the suppression hearing. As the lead detective assigned to the case, he met with the responding officers and interviewed the victims. The police department's surveillance unit retrieved the surveillance video from the victim's store and released it to local news stations. Several days later, Detective Wilfert received a tip that led him to develop the [Petitioner] as a suspect. He compiled a photographic lineup and showed it to the victim, who identified the [Petitioner] as the gunman. Detective Wilfert obtained an arrest warrant for the [Petitioner], and the [Petitioner] was arrested the following day, March 18, 2011, at his mother's residence as he exited his vehicle. Inside of the vehicle, police discovered a handgun under the driver's seat. A fingerprint lifted from the gun matched the [Petitioner], and forensic analysis by the Tennessee Bureau of Investigation revealed that this handgun fired the .40 caliber casings recovered from the Lewis Street Market.

After the [Petitioner]'s arrest, police seized the [Petitioner's] vehicle and cellular phone, and Detective Wilfert obtained a search warrant for both pieces of property. Upon searching the [Petitioner]'s car, police officers discovered a blue baseball cap, two pairs of sunglasses, and a magazine for a Glock .40 caliber pistol. A series of text messages were recovered from the [Petitioner]'s cellular phone and read into

4

evidence. These messages discussed the [Petitioner] taking a "major loss" on his money and having a "near-death" experience as a result of a "shootout."

Travis Bowman, the [Petitioner]'s cousin, testified that he was the other individual that entered the Lewis Street Market with the [Petitioner] on March 15, 2011. Earlier that evening, they met two other men at an apartment complex in east Nashville, and all four left together in a white Pontiac. Mr. Bowman recalled that during the car ride, the [Petitioner] and the driver of the Pontiac discussed "some money" and said they "needed money." Mr. Bowman claimed, however, that he did not know the [Petitioner] intended to rob the Lewis Street Market. The driver pulled into Lewis Street Market, and the [Petitioner] exited the car and walked towards the store. While looking for his money clip, Mr. Bowman found a handgun on the floorboard of the car and asked the other two passengers whether they had dropped anything. The driver told Mr. Bowman, "[N]o, that's for you. . . . [Y]ou need to get out and help your cousin."

Mr. Bowman exited the vehicle and told the [Petitioner] to "let this go," but the [Petitioner] responded, "I got this," and entered the store. Mr. Bowman followed the [Petitioner] into the store. The [Petitioner] approached the owner and "wrestled [him] to the ground, pulled out the gun, and hit him a few times." As the [Petitioner] approached a second employee in the store, the owner retrieved a gun and "shots began." Mr. Bowman testified that the [Petitioner] shot his weapon first, and the owner returned fire. Mr. Bowman did not fire his gun in the store. The [Petitioner] and Mr. Bowman fled the store and left the scene in the white Pontiac. Mr. Bowman put the gun back on the floorboard of the car and was dropped off at his home. The [Petitioner] told him to "lay low, . . . don't say anything, . . . everything will be alright." Several days later, Mr. Bowman was contacted by police regarding his involvement in the incident.

On cross-examination, Mr. Bowman acknowledged that he had been indicted on a number of counts related to the attempted robbery and, if convicted, would face a lengthy prison sentence. He agreed that he hoped his cooperation with authorities would help him receive a better sentence but denied that he had received any promises in exchange for his testimony. He conceded that after the attempted robbery, he did not contact the police and lied to his family about his involvement. He maintained that he did not know the [Petitioner] intended to rob Lewis Street Market until they pulled into the parking lot and agreed that the [Petitioner] never talked about hurting anyone prior to entering the store.

The State also introduced into evidence recorded phone calls that the [Petitioner] made from the county jail and played them for the jury.

*Pierce v. State*, 2018 WL 5793575, at *1–3.

5

The TCCA proceeded to summarize the record developed at the evidentiary hearing in the post-conviction trial court, as follows:

> At the post-conviction hearing, the Petitioner testified that trial counsel began representing him in general sessions court and continued to represent him throughout his trial and direct appeal. The Petitioner said that he was confined in prison in Hardeman County prior to trial. Trial counsel did not visit the Petitioner in prison; nevertheless, they had sufficient communication about the case.
>
> The Petitioner asserted that when he entered the store, he did not demand money from the owner or the employee; accordingly, the State did not adduce proof of a robbery. The Petitioner acknowledged Bowman's testimony that if the shooting had not started, a robbery probably would have occurred; however, the Petitioner argued that counsel should have objected to Bowman's testimony because it was inconsistent with his earlier testimony and because it was speculative. The Petitioner also complained that trial counsel failed to challenge the sufficiency of the evidence supporting the attempted aggravated robbery conviction in the motion for new trial, which failed to preserve the issue for appeal.
>
> The Petitioner said that he and trial counsel discussed the events at the store "to come up with a scenario" but that trial counsel refused to "put any scenario in there." Trial counsel advised that he did not want the Petitioner to testify if the Petitioner intended to lie. Trial counsel further advised that if the Petitioner chose to testify untruthfully, trial counsel would not ask the Petitioner questions while he was on the stand, and the jury would know the Petitioner was lying. The Petitioner said that trial counsel could not have known whether the Petitioner was lying because the Petitioner never told trial counsel his version of events. The Petitioner insisted that he wanted to testify in order to tell the jury that he "wasn't trying to kill nobody." He acknowledged, however, that he was convicted of the lesser-included offense of attempted second degree murder. The Petitioner noted that trial counsel told him the State could use his aggravated robbery convictions to impeach his credibility if he testified.
>
> The Petitioner complained that trial counsel did not do any investigation of the ballistics, noting that one bullet the Petitioner fired did not land near the owner, which showed the Petitioner was not shooting at the owner. The Petitioner maintained that he fired three shots just to get out of the store.
>
> On cross-examination, the Petitioner said that he was incarcerated prior to trial because he violated his probation on four robbery convictions and three attempted robbery convictions. Before trial, the Petitioner and trial counsel "had two big arguments" about how the case would proceed and trial counsel's failure to prepare the Petitioner to testify. Therefore, the Petitioner chose to represent himself during part of voir dire; however, before voir dire ended, the Petitioner decided to have trial counsel represent him.

The State repeatedly asked the Petitioner what his trial testimony would have been, but the Petitioner was reluctant to reveal his prospective trial testimony. He eventually stated that before entering the store, he thought only one person was inside, but, after entering the store, he discovered two people were inside. Upon being pressed for further details, the Petitioner responded, "That it is [sic] whole thing I just said, we never prepared to [sic] what I was going to say. . . . We never prepared it."

The Petitioner hesitated to give further details about the day of the offense, explaining that he should discuss the issue with his lawyer because he did not want to compromise his "5th Amendment right[s]" in the event he was granted a new trial. However, after the post-conviction court advised the Petitioner that it would not be able to evaluate whether the Petitioner suffered prejudice if he refused to reveal how he would have testified at trial, the Petitioner conceded that he entered the store to rob "an Iranian dude . . . for some dope" but maintained that he did not intend to rob the store. He said that he entered the store before Bowman, that he and Bowman had their guns out when they entered the store, and that the owner of the store was the first person to fire a gun. The Petitioner said, "[M]y main thing about testifying is because I was charged [with] attempted first-degree murder and I never tried to kill nobody."

The Petitioner acknowledged that Bowman testified that if shooting had not started, a robbery would have occurred. The Petitioner further acknowledged that Bowman testified that he overheard the Petitioner having a telephone conversation during the drive to the store, during which the Petitioner stated he needed money.

Trial counsel testified that he had been with the public defender's office for over twenty years and that he practiced only criminal law. He represented the Petitioner throughout trial and on direct appeal except for the brief time he served as "elbow counsel" while the Petitioner represented himself. Trial counsel asserted that he was prepared to try the Petitioner's case.

Trial counsel and the Petitioner discussed the charges, potential trial strategies, problems with the case, and the motions that could be filed. Trial counsel recalled that the State's proof was that the owner of the store had identified the Petitioner during a lineup; the police had a surveillance video of the crime; Bowman would testify against the Petitioner; the Petitioner had made incriminating telephone calls from jail; and a gun was found which matched ballistics from the scene.

Trial counsel explained that the defense had two trial strategies: (1) that the owner of the store's identification of the Petitioner was not certain and (2) that the State failed to adduce proof of an attempted premeditated first degree murder. Because the State's proof of identification was strong, trial counsel thought an "elements-type defense" was likely to be more successful. The Petitioner was more interested in establishing that he was not the perpetrator and that the State could not prove he

was the person on the surveillance video or in the market. Trial counsel and the Petitioner discussed extensively that the Petitioner was the person on the surveillance video; nevertheless, trial counsel thought that he was not prohibited ethically from challenging the State's proof regarding the identity of the person on the video.

Trial counsel did not "think it was ever seriously discussed that [the Petitioner] would testify and claim that he was not the person in the video." Trial counsel explained that such testimony was different from challenging the State's proof of identity and would have been "fraudulently represent[ing] something to the [trial court]." Trial counsel acknowledged that the Petitioner had a constitutional right to testify. Regardless, trial counsel thought he could not ethically support the Petitioner's testimony denying he was the person on the video because both he and the Petitioner knew that testimony would not be truthful. In that event, trial counsel would have been constrained to either make a "noisy withdrawal" or to allow the Petitioner to testify in a narrative fashion without being asked questions. The Petitioner readily accepted trial counsel's advice against testifying. Trial counsel opined that the Petitioner understood the . . . proceedings and knowingly and intelligently waived his right to testify.

On cross-examination, trial counsel said that the Petitioner received multiple plea offers from the State. The Petitioner was interested in settling the case, but the State never made an offer the Petitioner "could live with."

Trial counsel said that he probably advised the Petitioner that the State might use his prior aggravated robbery convictions to impeach his credibility if he testified but that he could not recall definitively whether he advised the Petitioner of that possibility. Trial counsel thought he filed a motion in limine to prevent the State from using the prior convictions for impeachment because they were too similar to the charged offenses.

Trial counsel conceded that he did not challenge the sufficiency of the evidence to support the attempted aggravated robbery conviction in the Petitioner's motion for new trial or on direct appeal but offered no specific explanation for his decision.

*Id.* at *3–5.

### III. CLAIMS OF THE PETITION

The Petition before the Court (Doc. No. 1) asserts the following claims:

(1) The denial of Petitioner's motion to suppress evidence of his identification by the victim from a photographic lineup, and the affirmance of that denial on appeal, violated his constitutional rights;

8

(2) The denial of Petitioner's motion to suppress evidence obtained from his illegal search and arrest, and the affirmance of that denial on appeal, violated his constitutional rights;

(3) The trial court abused its discretion and violated Petitioner's constitutional rights when it limited his cross-examination of Detective Anthony Wilfert;

(4) The trial court abused its discretion and violated Petitioner's constitutional rights when it allowed the State to amend the count of the indictment charging Petitioner with knowingly employing a firearm while committing or attempting to commit a dangerous felony;

(5) The trial court abused its discretion and violated Petitioner's constitutional rights in sentencing, by (a) categorizing him as a career offender based on crimes he committed as a juvenile, in violation of the rule of *Graham v. Florida*; (b) ordering his sentences to run consecutively, and (c) proceeding without submitting these sentence-enhancement issues for determination by the jury; and

(6) The state courts violated his Sixth and Fourteenth Amendment rights when they ruled that trial counsel did not render ineffective assistance by (a) failing to conduct a thorough factual and legal investigation; (b) failing to apprise Petitioner of his rights with respect to testifying at trial, and preventing Petitioner from testifying; (c) failing to challenge the sufficiency of the evidence supporting the attempted aggravated robbery conviction; (d) failing to pursue ballistics evidence in relation to Petitioner's weapons charge; and (e) failing to object when the State used Petitioner's accomplice as a witness, when that accomplice should have been charged under a criminal responsibility theory.

(Doc. No. 1 at 4–14; Doc. No. 23 at 2–3.[2])

---

[2]    In the Reply, Petitioner affirms Respondent's characterization of his claims, including his first, second, fourth, fifth, and sixth ineffective-assistance subclaims, which he asserts "are properly before this Honorable Court for habeas review." (*See* Doc. No. 23 at 2–3.) He does not take the same stance with regard to the third ineffective-assistance subclaim, which asserted that counsel "failed to exert every reasonable

### III. LEGAL STANDARD

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence" upon the conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Prior to the passage of AEDPA, district courts applied de novo review to determine whether "the relevant state court had erred on a question of constitutional law

---

effort" to ensure that the trial court complied with the law when it restricted counsel's ability to cross-examine Detective Wilfert. (Doc. No. 1 at 14.) In the Reply, Petitioner clarifies that his intent for this ineffective-assistance subclaim is to "merge" it with Claim 3 as his assertion of cause excusing any procedural default of that claim. (Doc. No. 23 at 2.) Accordingly, the Court treats the third ineffective-assistance subclaim as withdrawn.

or on a mixed constitutional question." *Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring). But now, where state courts have ruled on the merits of a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. An "unreasonable application" under this subsection occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *White v. Woodall*, 572 U.S. 415, 426 (2014). A state court decision is not unreasonable under this standard simply because the federal court, "in its independent judgment," finds it erroneous or incorrect. *Williams*, 529 U.S. at 411. Rather, to be actionable

under Section 2254(d)(1), the state court's decision "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419). An objectively unreasonable decision is one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination. *Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002). Rather, the determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotation marks omitted). Moreover, a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)). Finally, the petitioner may not prevail under Section 2254(d)(2) simply by showing that a fact was unreasonably determined; he "must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-

court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). This standard "was meant to be" a high hurdle for petitioners, consistent with the principle that habeas corpus functions as a guard against only "extreme malfunctions" in the state's administration of criminal justice. *Harrington*, 562 U.S. at 102; *see also Woods*, 575 U.S. at 316.

Even AEDPA's demanding review is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court.[3] *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

---

[3]     In Tennessee, the Court of Criminal Appeals is the highest appellate court to which appeal must be taken in order to properly exhaust a claim. *See* Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F.3d 398, 402–03 (6th Cir. 2003).

13

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim or state law deems the claim waived),[4] then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to

---

[4]     The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. *Id.* § 40-30-106(g).

14

him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## IV. ANALYSIS

A. <u>Claim 1 – Denial of the Motion to Suppress Identification Evidence</u>

In Claim 1, Petitioner asserts that the trial court's denial of his motion to suppress evidence of his identification from a photographic lineup, and the affirmance of that denial on appeal, violated his constitutional rights. (Doc. No. 1 at 4–5 (citing *Neil v. Biggers*, 409 U.S. 188 (1972), and *Simmons v. United States*, 390 U.S. 377 (1968)).) He claims that "the pretrial identification

15

was clearly impermissibly suggestive and gave rise to a very substantial likelihood of irreparable misidentification." (*Id.* at 4.) Because Petitioner fully exhausted this claim in state court, the question on habeas review is whether the state court's resolution of the claim was objectively unreasonable. *Woods*, 575 U.S. at 316.

On direct appeal, the TCCA analyzed this claim as follows:

The Defendant argues that the trial court erred in denying his motion to suppress the victim's photographic identification of the Defendant and any subsequent identification testimony by the victim. He asserts that the photographic lineup procedures used by police were so suggestive as to create an irreparable likelihood of misidentification and that any subsequent identification by the victim was tainted by the initial identification procedures.

Our analysis of this issue is based upon the United States Supreme Court holdings in *Simmons v. United States*, 390 U.S. 377 (1968), and *Neil v. Biggers*, 409 U.S. 188 (1972). In *Simmons*, the Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384; *see also State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998). The risk of an eyewitness making an incorrect identification is greater if the police show the eyewitness a lineup where a single photograph "is in some way emphasized." *Simmons*, 390 U.S. at 383. In addition, the risk of misidentification increases "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.* This court has noted that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar." *State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing *United States v. Wade*, 388 U.S. 218, 233 (1967); *Shye v. State*, 506 S.W.2d 169, 173 (Tenn. Crim. App. 1973); *Young v. State*, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)).

In *Biggers*, the Court established a two-part analysis which the trial court must apply to determine the validity of a pre-trial identification. 409 U.S. at 198–99. First, the trial court must determine whether the identification procedure was unduly suggestive. *Id.* at 198. Next, if the trial court determines that the identification procedure was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. *Id.* at 199. In Tennessee, it is unnecessary to apply the totality of the circumstances test described in *Biggers* if the trial court determines that the identification procedure was not unduly suggestive. *See State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

In the present case, the Defendant avers that the photographic lineup was inherently suggestive because the Defendant's photograph depicts a more heavyset person with a more prominent beard and mustache than the other persons depicted in the lineup. Further, he argues that Detective Wilfert's suggestion to the victim to "discard those that he knows it is definitely not" suggested that the assailant was depicted in the lineup. Finally, he maintains that by informing the victim that the Defendant would be arrested, Detective Wilfert suggested that the victim had selected the correct person and thereby tainted any subsequent identification. The trial court denied the Defendant's motion, finding that there "was no proof that the identification utilized by the detective in this case was unduly suggestive as to this identifying witness." The court further found that because the victim made his identification prior to learning that the Defendant would be arrested, his identification was not tainted.

Upon our review of the record, we agree with the trial court and conclude that there was nothing unduly suggestive about the photographic lineup or the overall identification process. The photographic lineup contains photographs of six African American males, all of whom had similar hair styles and facial hair. Each photograph is uniform in size, and none "is in some way emphasized" more than the others. Contrary to the Defendant's claims, he does not appear to be significantly heavier set than the other individuals or to have significantly different facial hair. Rather, all of the individuals have mustaches and appear to be of a fairly similar build. In sum, we conclude that there was nothing about the Defendant's photograph that was "grossly dissimilar" to the photographs of the other men included in the lineup.

Additionally, we agree that the manner of the identification process was not unduly suggestive. Detective Wilfert reviewed the identification procedures with the victim prior to showing him the lineup, and the victim signed a form acknowledging his understanding of these procedures. Detective Wilfert told the victim that the perpetrator's photograph may not be included in the lineup and that he should only select an individual if he was certain that he was the perpetrator. We do not consider Detective Wilfert's statement to the victim that he could "discard those that he knows it is definitely not" to be unduly suggestive. At no point did Detective Wilfert or anyone else suggest to the victim which photograph to choose. Likewise, we do not view Detective Wilfert's statement that he would seek an arrest warrant for the Defendant as unduly suggestive. This comment was made only after the victim had made an identification of the Defendant and signed a form acknowledging his identification. We fail to see how this post-identification comment impacted the reliability of the victim's identification or tainted any subsequent identifications made by the victim. *See State v. Walter Lee "Steve" Allen*, No. 03C01–9712–CC–00547, 1999 WL 135051, at *6 (Tenn. Crim. App. Mar. 15, 1999) (finding procedure was not unduly suggestive where "suspect" was written beside the defendant's photograph after the witness made an identification). It is not a rare occasion that the individual selected in a photographic lineup is subsequently arrested and later identified in court by the victim. Finally, we

17

acknowledge that there was conflicting testimony regarding the victim's level of certainty in selecting the Defendant's photograph; however, these inconsistencies went to the credibility of the witness's identification and not to the reliability of the photographic identification. *See id.* (reasoning that the identifying witness's inconsistencies in her identification went to the credibility of her identification rather than the reliability of her identification). Because we have determined that the identification procedures were not unduly suggestive, we need not assess the reliability of the victim's identification. *See Butler*, 795 S.W.2d at 686.

*State v. Pierce*, 2015 WL 2102003, at *5–7.

Petitioner repeats in this Court his argument that the photographic lineup presentation in his case was unduly suggestive, based on (1) Detective Wilfert's comments that the victim could discard those photographs that he knew definitely did not depict his assailant, and that an arrest warrant would be sought for the person in the photograph chosen by the victim, and (2) the disparity in the hair and body types depicted in Petitioner's photograph versus the other five photographs in the lineup. (Doc. No. 23 at 7–9.) Petitioner then proceeds to argue that his identification by the victim was unreliable (*id.* at 9–15), and that "the trial court committed reversible error in allowing [it] into evidence." (*Id.* at 15.) However, the TCCA found that, contrary to Petitioner's claims, there was no notable disparity in the hair or body types depicted in the photographs shown to the victim, and no way in which Petitioner's photograph was "'in some way emphasized' more than the others." *State v. Pierce*, 2015 WL 2102003, at *6 (quoting *Simmons*, 390 U.S. at 383). These factual findings are entitled to a presumption of correctness that Petitioner has not rebutted by clear and convincing evidence. 28 U.S.C. §§ 2254(d)(2), (e)(1).

The TCCA further found that the statements made by Detective Wilfert were simply not problematic, as they could not be construed as suggesting to the victim which photograph to choose, but only amounted to a recommendation for simplifying the selection process and a post-selection observation that the person identified would be arrested. *Id.* at *7. Because it found that the procedure was not unduly suggestive, the TCCA reasonably declined to assess the reliability

18

of the identification. *Cf. Biggers*, 409 U.S. at 199 (identifying "central question" of "whether . . . the identification was reliable even though the [identification] procedure was suggestive"); *see Perry v. New Hampshire*, 565 U.S. 228, 241 (2012) ("The due process check for reliability [of the identification] . . . comes into play only after the defendant establishes improper police conduct."). In sum, the TCCA identified the correct legal principles from the *Simmons* and *Biggers* decisions and applied those principles in an objectively reasonable way.

This Court's review of the suppression hearing transcript (Doc. Nos. 13-3, 13-4) and photographic lineup (Doc. No. 13-7 at 4) does not reveal grounds for finding otherwise. Though far from high-resolution, the image of the photographic lineup contained in the state-court record clearly depicts six African-American men of similar age and appearance. The lineup cannot be said to be "so impermissibly suggestive that there was a substantial likelihood of irreparable misidentification." *United States v. Washington*, 714 F.3d 962, 967 (6th Cir. 2013) (finding no merit to claim concerning photo array revealing "five African-American men in addition to the defendant, at least four of whom appear to have some sort of facial hair, and all five of whom appear to be around the same age as the defendant," with two having skin tone "very close" to the lighter-skinned defendant). Accordingly, Petitioner is not entitled to habeas relief on Claim 1.

B. Claim 2 – Denial of the Motion to Suppress Other Evidence

Petitioner next claims that the denial of his motion to suppress evidence obtained from his illegal search and arrest, and the affirmance of that denial on appeal, violated his constitutional rights. Though Petitioner invokes the Sixth and Fourteenth Amendments in presenting this claim (*see* Doc. No. 1 at 6), constitutional issues of admissibility of evidence seized in conjunction with an illegal search, or incident to an unlawful arrest, arise under the Fourth Amendment prohibition against "unreasonable searches and seizures." U.S. Const. amend. IV; *see Northrop v. Trippett*,

19

265 F.3d 372, 378 (6th Cir. 2001) (distinguishing between Fourth Amendment claim concerning admission or exclusion of evidence and Sixth Amendment claim based on "counsel's failure to move for the suppression of evidence that should be excluded under the Fourth Amendment"); *Coleman v. Richard*, No. 15-CV-1962, 2018 WL 400322, at *6 (N.D. Ohio Jan. 11, 2018) ("The Fourteenth Amendment relates to suppression of evidence only through the application of the Fourth Amendment exclusionary rule.") (citing cases). Such issues must be litigated at trial or on direct appeal, *Northrop*, 265 F.3d at 378, as they were here. *See State v. Pierce*, 2015 WL 2102003, at *7–12. But "[b]ecause questions regarding the admissibility of otherwise relevant evidence seldom touch upon the 'basic justice' of a conviction, the Supreme Court bars Fourth Amendment claims from habeas review." *Northrop*, 265 F.3d at 378 (citing, *e.g.*, *Stone v. Powell*, 428 U.S. 465, 494–95 (1976)).

Claim 2 presents what is in substance a Fourth Amendment claim for failure to suppress evidence that was allegedly obtained unlawfully. It is therefore not cognizable on habeas review.

C. <u>Claim 3 – Limited Cross-Examination of Detective Wilfert</u>

In Claim 3, Petitioner asserts that the trial court abused its discretion in limiting his counsel's cross-examination of Detective Wilfert concerning Wilfert's "untruthful and dishonest behavior" while working for the NPD, which should not have been limited because it went to the witness's credibility and reliability. (Doc. No. 1 at 9.) Petitioner claims that this constraint on the cross-examination of Wilfert violated his Sixth and Fourteenth Amendment rights. (*Id.*)

Petitioner presented this claim to the TCCA on direct appeal, but not as a federal constitutional claim. "The federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citing *Franklin v. Rose*, 811 F.2d 322, 324–25 (6th Cir. 1987)). Fair

presentation requires the federal petitioner to have advanced "the same claim under the same theory" in state court. *Kelly*, 846 F.3d at 828 (citation omitted). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted).

Petitioner's argument on direct appeal was based entirely on Tennessee Rule of Evidence 608(b), concerning the admissibility in state court of character evidence for impeachment purposes. (*See* Doc. No. 13-16 at 49–51.) There was no explicit claim that the trial judge's failure to allow cross-examination into Wilfert's alleged acts of dishonesty violated Petitioner's rights under the U.S. Constitution or federal law, nor did his appellate brief cite cases employing federal constitutional analysis, facts within the mainstream of constitutional law, or any other material sufficient to alert the TCCA that a federal constitutional violation was being claimed. *See McMeans*, 228 F.3d at 681–82 (listing criteria for finding federal claim fairly presented in state court; finding issue not fairly presented where petitioner "focused entirely" on state law and "did not cite any federal precedent and his appellate brief only alleges that the trial judge's limitation on cross-examination denied him a 'fair trial' and 'due process'"). Because Petitioner is now barred from presenting the claim under federal law in state court, *see* Tenn. Code Ann. §§ 40-30-102(a) and (c), 40-30-106(g), Claim 3 is defaulted.

Although Petitioner asserts that cause for the default lies in trial counsel's constitutionally ineffective failure "to exert every reasonable effort necessary to ensure that the Trial Court was in compliance with the law as it relates to the trial court restricting Counsel from questioning the lead detective on cross-examination" (Doc. No. 1 at 14; *see* Doc. No. 23 at 2), that ineffective-assistance claim was itself procedurally defaulted when Petitioner failed to raise it on post-conviction appeal. (*See* Doc. No. 13-26 at 8–9.) And "a procedurally defaulted ineffective-assistance-of-counsel

claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards*, 529 U.S. at 450–51. Petitioner has made no effort to demonstrate cause for the default of this ineffective-assistance claim. Accordingly, counsel's alleged ineffectiveness cannot excuse the default of Petitioner's claim of trial court error in restricting cross-examination into Wilfert's alleged acts of dishonesty. Claim 3 is thus barred from habeas review.

D. Claim 4 – Amendment of the Indictment

Petitioner claims that the trial court abused its discretion and violated his Sixth and Fourteenth Amendment rights when it allowed the State to amend the count of the indictment that originally charged him with "knowingly employ[ing] a firearm during the commission of or the attempt to commit a dangerous felony" (Doc. No. 13-1 at 9), so as to specify that the "dangerous felony" in question was attempted first-degree murder. (Doc. No. 1 at 10–11.) The TCCA addressed the merits of this claim, observing that both the Sixth Amendment and a corresponding provision of the Tennessee Constitution "entitled [Petitioner] to knowledge of 'the nature and cause of the accusation'" he faced. *State v. Pierce*, 2015 WL 2102003, at *15. The TCCA found that the trial court did not abuse its discretion, and that Petitioner was not prejudiced by the amendment to this count of the indictment, reasoning as follows:

> Here, the original count of the indictment charging the Defendant with employment of a firearm during a dangerous felony provided, in relevant part, that the Defendant "did knowingly employ a firearm during the commission of or the attempt to commit a dangerous felony as defined in Tennessee Code Annotated § 39-17-1324(b), and against the peace and dignity of the State of Tennessee." Prior to trial, the Defendant filed a motion to dismiss this count for failure to give notice of the predicate felony. At the hearing on the matter, the State responded that the indictment placed the Defendant on notice because it contained only a single count qualifying as a dangerous felony under Tennessee Code Annotated section 39-17-1324: attempt to commit first degree murder. The Defendant agreed that he was aware that only one count in the indictment could be the predicate felony but maintained that the court should dismiss the indictment and opposed any

22

amendment by the State. The trial court found that the indictment provided sufficient notice of the predicate felony but allowed the State to amend the indictment "so that everyone's clear, including the jury, so there's no confusion about that."

We begin our analysis by noting that the original count, notwithstanding its failure to specify the predicate felony, was not void because it served its "overriding purpose" of providing notice to the Defendant. In so noting, we recognize that "[g]enerally, an indictment for a violation of [Tennessee Code Annotated] section 39-17-1324 that does not name the underlying dangerous felony does not provide the defendant with adequate notice of the crime charged." *State v. Demeko Gerard Duckworth*, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *21 (Tenn. Crim. App. May 10, 2013). This is so because the statute provides 11 options for dangerous felonies that would support the conviction and, thus, "leaves the defendant with inadequate notice of the charges against him." *Id.*; *see* T.C.A. § 39-17-1324(h)(2)(i)(1). However, where the indictment, as does the one in this case, includes only one count that qualifies as a dangerous felony under section 39-17-1324, the indictment is not void for lack of notice. *See Demeko Gerard Duckworth*, 2013 WL 1933085, at *22 (concluding that because only one count in the indictment, attempted first degree murder, qualifies as a dangerous felony under section 39-17-1324, "it is 'reasonably clear' that the charge of employing a firearm during the commission of a dangerous felony is connected to the count of attempted first degree murder such that the indictment is not void for lack of notice") (citing and quoting *State v. Youngblood*, 287 S.W.2d 89, 91 (Tenn. 1956) (holding that "where it is reasonably clear from the averments of the second count that this is connected with and a part of the preceding count . . . such a count may be considered good")); *cf.*, *State v. Willie Duncan*, No. W2013-02554-CCA-R3-CD, 2014 WL 4243746, at *9 (Tenn. Crim. App. Aug. 27, 2014) (concluding that an indictment for employing a firearm during the commission of a dangerous felony without specifying the predicate felony failed to provide adequate notice where the defendant was charged with multiple felonies that could qualify as dangerous felonies under the statute).

In any event, the State properly amended the indictment in accord with the requirements of Tennessee Rule of Criminal Procedure 7(b)(2). Although the Defendant opposed the amendment, it occurred before the jury was sworn, the point at which jeopardy attaches in a jury trial. *State v. Pennington*, 952 S.W.2d 420, 422 (Tenn. 1997) (citing *Crist v. Bretz*, 437 U.S. 28, 35 (1978); *Serfass v. United States*, 420 U.S. 377, 388 (1975)). Additionally, the indictment already charged the Defendant with attempted first degree murder, and thus, amending count 3 to specify this charge as the predicate felony underlying the count for employment of a firearm during the commission of a dangerous felony did not charge an additional or different offense. Further, no substantial right of the Defendant was prejudiced by the amendment because, as previously discussed, the original indictment accomplished the "overriding purpose" of providing the Defendant with notice of the charges against him. Accordingly, the trial court did not abuse its discretion in

23

allowing the amendment of the indictment. The Defendant is not entitled to relief on this issue.

*Id.* at \*15–16.

A criminal defendant has a constitutional right to be informed in his indictment of the nature and cause of the accusation against him, so that he is "sufficiently apprise[d] . . . of what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 763 (1962) (citations omitted). In this case, the TCCA reasonably found that the indictment sufficiently apprised Petitioner of the nature of the charges he faced. The state court determined that, although generally an indictment that charges use of a firearm to commit an unnamed dangerous felony does not provide sufficient notice to support a conviction under Tenn. Code Ann. § 39-17-1324, an exception exists where that count of the indictment may be read together with the indictment's other counts to provide adequate notice of the dangerous felony the defendant is charged with using a firearm to commit. Because another count of the original indictment in this case charged Petitioner with attempted first-degree murder, and no other "dangerous felony" was ultimately charged,[5] *see* Tenn. Code Ann. § 39-17-1324(i)(1) (enumerating 12 "dangerous" felonies), the TCCA reasonably found that Petitioner received sufficient notice of the nature of the crime charged under Section 39-17-1324. In addition, this Court notes that Petitioner had notice of the nature of the charged dangerous felony in view of the pretrial debate over whether the jury should be instructed that attempted second-degree murder, as a lesser included offense of the indicted charge of attempted first-degree murder,

---

[5] Petitioner was originally charged with a second dangerous felony—especially aggravated kidnapping (count 2 of the original indictment)—but that charge was dismissed by the State just prior to trial. (*See* Doc. No. 13-6 at 22.) Petitioner objects in his Reply that "having me charged with two felon[ies] for two to three years and then the week of trial chang[ing] the whole charge is unfair." (Doc. No. 23 at 16.) But even if the especially aggravated kidnapping count had not been dismissed, the Tennessee Supreme Court has clarified that "[t]he fact that the indictment does not say which of the two possible predicate felonies will be used to prove the 'dangerous felony' element of the firearm offense does not mean that the indictment falls below the minimum required to meet the constitutional mandate of apprising the defendant of the nature and cause of the accusation against him." *State v. Duncan*, 505 S.W.3d 480, 491 (Tenn. 2016).

24

would also qualify as a dangerous felony under Section 39-17-1324. (*See* Doc. No. 13-1 at 99–100; Doc. No. 13-6 at 4–10.) Finally, the TCCA reasonably determined that, in light of the sufficient notice provided by reading the counts of the indictment together, "no substantial right of the [Petitioner] was prejudiced" by the indictment's late amendment to specify the underlying felony. Petitioner is not entitled to relief on Claim 4.

E. Claim 5 – Sentencing

Petitioner claims that the trial court abused its discretion and violated Petitioner's constitutional rights in sentencing, by (a) categorizing him as a career offender based on crimes he committed as a juvenile, in violation of the rule of *Graham v. Florida*; (b) ordering his sentences to run consecutively, and (c) proceeding without submitting these sentence-enhancement issues for determination by the jury. (Doc. No. 1 at 12–13.) Respondent argues that these constitutional claims were procedurally defaulted when Petitioner failed to raise them as such before the TCCA, with the exception of the claim that his sentencing as a career offender violated the Eighth Amendment and *Graham*.

In mounting a constitutional challenge to his sentence enhancement before the TCCA, Petitioner "cite[d] the United States Supreme Court's decision in *Graham v. Florida*, 560 U.S. 48 (2010), where the Court held that the Eighth Amendment prohibits a sentence of life without parole for juveniles who commit nonhomicide offenses," and "argue[d] that the reasoning in *Graham* likewise should prevent 'enhancement of his sentence from Range I to career offender status based solely on acts he committed as a juvenile.'" *State v. Pierce*, 2015 WL 2102003, at *18. Respondent points out that Petitioner did not present this claim to the TCCA under the Sixth and Fourteenth Amendments, as he does in this Court. Nevertheless, the claim was argued under *Graham* before the TCCA, as it is here. The Court will thus consider its merits, applying AEDPA deference.

25

The TCCA rightly found *Graham* and the Eighth Amendment concerns it addressed to be "clearly distinguishable" from Petitioner's case, because the holding in *Graham* only prohibits juvenile offenders from being sentenced to life in prison without the possibility of parole, based on the constitutional concern with imposing the most severe adult penalties upon developmentally less culpable juveniles. *Id.* at *19–20. Whereas,

> [t]his same rationale does not hold true when applied to the Defendant. Although his "failings as a minor" impacted his career offender status, we cannot ignore the fact that the Defendant is an adult offender being held accountable for acts he committed as an adult. As a juvenile, the Defendant was given an opportunity at maturity and rehabilitation after being convicted of seven felony offenses. Despite these opportunities, he chose to continue his criminal conduct into adulthood.

*Id.* at *19. *See, e.g., United States v. Graham*, 622 F.3d 445, 462 (6th Cir. 2010) ("The instant defendant is not similar to the situation that the Supreme Court addressed in *Graham*—he is not a "juvenile offender" for purposes of the punishment he received in the instant case.") (citing, *e.g., United States v. Scott*, 610 F.3d 1009, 1018 (8th Cir. 2010) ("The Court in *Graham* did not call into question the constitutionality of using prior convictions, juvenile or otherwise, to enhance the sentence of a convicted adult.")). The TCCA further found that the "limited holding" in *Graham* could not in any event be applied to Petitioner because his sentence, though lengthy, is not for life without the possibility of parole—which is the only sentence that *Graham* found unconstitutional when applied to juveniles. *Id.* at *20 (citing *State v. Tavaria Merritt*, No. M2012–00829–CCA–R3–CD, 2013 WL 6505145, at *5 (Tenn. Crim. App. Dec. 10, 2013) ("[S]tate and federal courts have overwhelmingly refused to extend *Graham* to juvenile offenders who were not sentenced to life without the possibility of parole but nonetheless received lengthy sentences that might prevent their release.")). "A sentence that provides for the possibility of release, even after 51 years, . . . is materially distinguishable from a sentence without the possibility of release," and AEDPA thus

26

bars habeas relief from the former under *Graham* and its progeny. *Pinchon v. Byrd*, No. 21-5356, 2021 WL 6101398, at *3 (6th Cir. Dec. 21, 2021), *cert. denied*, 142 S. Ct. 1687 (2022).

In short, the TCCA reasonably found that Petitioner's prior juvenile offenses were properly counted as predicates for his designation as a career offender under state law, *State v. Pierce*, 2015 WL 2102003, at *18 (citing Tenn. Code Ann. § 40–35–108(b)(3)(A)), and that *Graham* did not apply to render his lengthy sentence as a career offender constitutionally infirm.

Moreover, it is clear that Petitioner's consecutive sentencing was imposed in accord with Tennessee law, and that both his challenge to that sentencing and its resolution by the TCCA were entirely framed under state statutory and decisional law. *See id.* at *20–22. His federal habeas challenge to the state courts' application of state law is non-cognizable, even though framed as a violation of his Sixth and Fourteenth Amendment rights. *Johnson v. Holloway*, No. 3:14-CV-1071, 2016 WL 7378180, at *11 (M.D. Tenn. Dec. 20, 2016). As Judge Trauger explained in *Holloway*:

> [E]ven if the petitioner intended to allege, as respondent suggests, that the trial court's decision to order that his sentences run consecutively somehow violated his constitutional rights under the Fifth, Sixth and Fourteenth Amendments, he would still not be entitled to relief. Setting aside that such a claim has never been reviewed by the state courts, "[a] violation of state law is not cognizable in federal habeas corpus unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process. . . ." *Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008). The petitioner presents no facts, and there is no evidence in the record, to demonstrate that the imposition of consecutive sentences here "amount[ed] to a fundamental miscarriage of justice or a violation of due process." *Id.* Moreover, the imposition of consecutive sentences as authorized by state law does not, by itself, amount to a constitutional violation. *See Oregon v. Ice*, 555 U.S. 160, 169–69 (2009) (holding that the imposition of consecutive sentences does not implicate constitutional concerns under the Sixth Amendment); *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (internal quotation marks and citation omitted) (holding that "a sentence within the statutory maximum set by statute generally does not constitute cruel and unusual punishment"); *Sneed v. Donahue*, 993 F.2d 1239, 1244 (6th Cir. 1993) (holding that a claim challenging the state prisoner's aggregate prison sentence "involves a matter of state law," which "is not cognizable in a federal habeas corpus proceeding"). The petitioner is not entitled to relief on this claim.

*Id.*

Finally, Petitioner's "assert[ion] that the Trial Court and Court of Criminal Appeals violated the Petitioner's rights when the court failed to present the matter of enhancement before a jury of his peers" (Doc. No. 1 at 13) was not raised in state court and is clearly procedurally defaulted. Petitioner has not attempted to establish cause and prejudice excusing the default, and even if he had, the claim would fail on the merits. Tennessee law grants judges broad discretion to enhance sentences within a statutory range, *see* Tenn. Code Ann. § 40-35-210—an approach which the U.S. Supreme Court has noted "encounters no Sixth Amendment shoal," *Cunningham v. California*, 549 U.S. 270, 294 & n.18 (2007)—and, in any event, the trial court in this case "was required to sentence [Petitioner] to the maximum sentence within Range III for his convictions" after finding him to be a career offender. *State v. Pierce*, 2015 WL 2102003, at *20 (citing Tenn. Code Ann. § 40-35-108(c)).

In sum, Petitioner is not entitled to habeas relief on any of his sentencing claims.

## F. Claim 6 – Ineffective Assistance of Counsel

In his sixth claim, Petitioner asserts that the state courts violated his Sixth and Fourteenth Amendment rights when they ruled that trial counsel did not render ineffective assistance by (a) failing to conduct a thorough factual and legal investigation; (b) failing to apprise Petitioner of his rights with respect to testifying at trial, and then preventing Petitioner from testifying; (c) failing to challenge the sufficiency of the evidence supporting the attempted aggravated robbery charge; (d) failing to pursue ballistics evidence in relation to Petitioner's weapons charge; and (e) failing to object when the State used Petitioner's accomplice as a witness, when that accomplice should have been charged under a criminal responsibility theory. (Doc. No. 1 at 14.) However, on post-conviction appeal to the TCCA, Petitioner asserted only that counsel was ineffective in "fail[ing]

to raise in his motion for new trial the 'sufficiency of the evidence' issue related to the attempted aggravated robbery count," "telling [Petitioner] that he would not allow him to testify at trial because his answers would be lies," and "fail[ing] to call a ballistics expert to corroborate [Petitioner's] claim that he was not firing at anyone specifically, but was discharging his weapon randomly as a means of escaping the store." (Doc. No. 13-26 at 8–9.) Accordingly, only subclaims (b), (c), and (d) above are arguably undefaulted.

Petitioner does not make any attempt to establish cause and prejudice to excuse the default of his claim regarding counsel's inadequate investigation (Claim 6(a)), or his claim of the "most important[ ]" instance of ineffective assistance: when counsel failed to object to the State using Petitioner's accomplice as a witness against him (Claim 6(e)). (Doc. No. 1 at 14.) These subclaims are therefore barred from habeas review.

Petitioner's exhausted claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. *Id.* at 687. To meet the first prong, Petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

When an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), in that "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question then is not whether the petitioner's counsel was ineffective; rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted). The TCCA correctly identified and summarized the *Strickland* standard applicable to Petitioner's claims of ineffective assistance. *Pierce v. State*, 2018 WL 5793575, at *6. Accordingly, the critical question is whether the state court applied *Strickland* reasonably in reaching its conclusions on each ground raised by Petitioner.

1. Claim 6(b)

In claiming trial counsel's ineffectiveness, the Petition asserts that counsel "failed to apprise the Petitioner of his rights as it related to the criminal proceedings at trial and counsel's decision not to allow the Petitioner to testify[.]" (Doc. No. 1 at 14.) Though this claim is stated

imprecisely, this Court, following the TCCA, construes it as concerning only Petitioner's right to testify in his own defense (or not) at trial. The TCCA resolved this claim as follows:

> The Petitioner contends that trial counsel deprived him of his constitutional right to testify by advising the Petitioner that "he would not allow him to testify at trial because his answers would be lies." The Petitioner maintains that "[t]rial counsel was not ethically prohibited from allowing [the Petitioner] to testify in his defense even if those answers might make him feel uncomfortable." Initially, we note that the Tennessee Supreme Court's Rules of Professional Conduct provide in pertinent part:
>
>> (b) A lawyer shall not offer evidence the lawyer knows to be false, except that a lawyer who represents a defendant in a criminal proceeding, and who has been denied permission to withdraw from the defendant's representation . . . may allow the client to testify by way of an undirected narrative or take such other action as is necessary to honor the defendant's constitutional rights in connection with the proceeding.
>
> Tenn. Sup. Ct. R. 8, RPC 3.3(b). Trial counsel correctly advised the Petitioner that if he intended to offer false or fraudulent testimony, trial counsel ethically would be unable to question the Petitioner and would be constrained to have the Petitioner testify in a narrative fashion.
>
> Moreover, the post-conviction court accredited trial counsel's testimony that he advised the Petitioner not to testify and that the State could impeach the Petitioner with his prior convictions. Trial counsel had a valid concern regarding an ethical issue if the Petitioner had chosen to testify completely contrary to his acknowledgment to trial counsel that the Petitioner was the person shown on the video. The Petitioner is not entitled to relief on this basis. *Scott Bradley Price v. State*, No. E2004-02718-CCA-R3-PC, 2005 WL 3479242, at *7 (Tenn. Crim. App. at Knoxville, Dec. 16, 2005).

*Pierce v. State*, 2018 WL 5793575, at *7. The TCCA thus found (1) that counsel legitimately concluded that he could not ethically question Petitioner if he intended to testify falsely at trial, and (2) that Petitioner had failed to rebut the post-conviction trial court's finding that counsel merely advised Petitioner against testifying, based on the concern that his credibility might then be impeached using the surveillance video and the evidence of his prior convictions.

The Petition presents the conclusory assertion that counsel failed to advise properly Petitioner concerning his right to testify. (Doc. No. 1 at 14.) It does not present factual allegations to support that assertion, *see* Habeas Corpus R. 2(c)(1)–(2) (requiring petition to provide facts supporting each ground for relief specified therein), *Guerrero v. Ford*, No. 1:17-CV-00103, 2019 WL 330878, at *12 (M.D. Tenn. Jan. 25, 2019),[6] much less clear and convincing evidence to overcome the state courts' factual finding that counsel simply (if strongly) advised against testifying due to the need for candor before the court and the potential for impeachment if he chose to testify. In his Reply, Petitioner for the first time provides pertinent background facts, asserting that counsel "psychologically de[terred]" him from testifying by using his expertise and the power imbalance between them to effectively cudgel Petitioner into not testifying, based on his opinion that a bad outcome would result if Petitioner took the stand and began to "lie or cook up some sorta stra[te]gy." (Doc. No. 23 at 17–19.) But the Court may not properly consider the offering in the Reply of "new factual bases that were not presented in [the] petition" and that support a claim of coercion by counsel, rather than a mere failure to give appropriate advice, because those factual bases effectively support a new claim despite "shar[ing] the common legal theory" of ineffective

---

[6]    In *Guerrero*, this Court applied Habeas Rule 2 as follows:

In the section of his petition devoted to this claim, Petitioner does not set forth any facts to support his allegation that the indictments for attempted first-degree murder were deficient because they failed to allege attempt and an overt act. Instead, he argues that the indictments were deficient because they did not charge him with criminal responsibility. (Doc. No. 1, Page ID# 21-26). Consequently, Petitioner has failed to properly plead a claim that the indictments for attempted first-degree murder should have been dismissed because they did not specifically allege attempt and failed to provide adequate notice that Petitioner committed an overt act. The Court leniently construes pro se pleadings but that liberality "does not require a court to conjure allegations on a litigant's behalf. . . ." *Erwin v. Edwards*, 22 Fed. Appx. 579, 580 (6th Cir. 2001). Dismissal of the claim, therefore, is appropriate under Habeas Rule 2.

Id. at *12.

assistance. *Royster v. Warden, Chillicothe Corr. Inst.*, No. 18-3362, 2018 WL 8138770, at *2 (6th Cir. Aug. 23, 2018) (citing, *e.g.*, *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005)).

On the record before it, the TCCA reasonably applied *Strickland* to determine that counsel did not perform deficiently in advising Petitioner regarding his right to testify in his own defense. Petitioner is not entitled to habeas relief on this claim.

2. Claim 6(c)

Petitioner claims that trial counsel was ineffective in failing to challenge the sufficiency of the evidence supporting his attempted aggravated robbery conviction (Doc. No. 1 at 14), implicitly challenging counsel's post-verdict effectiveness in seeking a new trial. In his brief on post-conviction appeal, Petitioner presented the issue to the TCCA in the following way: "trial counsel failed to raise in his motion for new trial the 'sufficiency of the evidence' issue related to the attempted aggravated robbery count, effectively waiving the issue for appeal. Because there was no evidence of a robbery presented at trial, counsel should have raised this issue [and] . . . should have objected when [Petitioner's] charge-partner, Travis Bowman, testified that a robbery probably would have occurred had shots not been fired." (Doc. No. 13-26 at 8.) The TCCA adjudicated this issue on the merits, as follows:

> The Petitioner asserts that trial counsel should have challenged the sufficiency of the evidence because the State adduced no proof a robbery occurred. The Petitioner maintains that counsel "effectively waiv[ed] the issue for appeal." We note, however, that sufficiency of the evidence is "an issue which is not waived by the defendant's failure to raise it in his motion for new trial." *State v. Bowman*, 327 S.W.3d 69, 93 (Tenn. Crim. App. 2009) (citing *State v. Boxley*, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001); Tenn. R. App. P. 3(e)).
>
> Moreover, the proof at trial revealed that Bowman heard the Petitioner discussing his need for money. Shortly thereafter, Bowman and the Petitioner met two other men, and the four men drove to the store. The Petitioner exited the car first, and, as Bowman felt on the floor of the car for his money clip, he felt a gun. The two men in the car urged Bowman to take the gun with him to help the Petitioner, saying that the Petitioner "has this [under control]." As they walked into the store, Bowman

33

pled with the Petitioner to buy some chips and leave the store, but the Petitioner responded, "I got this," which Bowman interpreted to mean the Petitioner and the other men had formed a plan to "get some money" and "rob the store." The Petitioner entered the store and wrestled with the owner of the store. Eventually, the owner got his own gun, and the Petitioner fired the first shot. The owner and the Petitioner exchanged gunfire as the Petitioner and Bowman ran outside and got in the car. We conclude that the State adduced sufficient proof to sustain the Petitioner's attempted aggravated robbery conviction; therefore, the Petitioner suffered no prejudice by trial counsel's failure to raise the issue on direct appeal. *See State v. Tyler Young*, No. W2013-01591-CCA-R3-CD, 2015 WL 513643, at *4 (Tenn. Crim. App. at Jackson, Feb. 6, 2015); *State v. Kevin L. Buford, Sr.*, No. M2010-01618-CCA-R3-CD, 2012 WL 1895953, at *21 (Tenn. Crim. App. at Nashville, May 24, 2012).

In a related issue, the Petitioner contends that trial counsel should have objected to Bowman's testimony that a robbery probably would have occurred if shots had not been fired, which the Petitioner asserts was only speculation. We note that even without Bowman's challenged testimony, the proof adduced at trial clearly established that the Petitioner intended to rob the store. Accordingly, we conclude the Petitioner did not suffer any prejudice by trial counsel's failure to object. *See Leonard Lebron Ross v. State*, No. 03C01-9802-CR-00077, 1999 WL 357339, at *4 (Tenn. Crim. App. at Knoxville, June 4, 1999).

*Pierce v. State*, 2018 WL 5793575, at *6–7.

The TCCA's application of both the deficient-performance and prejudice prongs of the *Strickland* analysis to this issue is clearly reasonable on its face. The Petition does nothing more than raise this issue concerning counsel's performance vis-à-vis the attempted aggravated robbery conviction; it does not allege facts to support a claim that counsel in some way waived the issue other than by failing to raise it in the motion for new trial, or that Petitioner was prejudiced by counsel's failures with regard to the evidence of robbery. Notwithstanding the deference due pro se pleadings, "[f]ederal courts are not required to review a petitioner's entire state court record to determine whether facts supporting the petitioner's claims exist." *Grimes v. Mays*, No. 3:19-CV-00585, 2022 WL 3582487, at *9 (M.D. Tenn. Aug. 19, 2022) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990)). Petitioner is not entitled to habeas relief on this claim.

3. Claim 6(d)

In his third and final exhausted claim of ineffective assistance, Petitioner asserts that counsel "failed to put the State to full adversarial testing when counsel failed to obtain funds or investigate the matter of ballistics in direct relation to the Petitioner's weapons charge." (Doc. No. 1 at 14.) On post-conviction appeal, he asserted that counsel's specific error in this regard was in failing to call a ballistics expert to support the defense that Petitioner "was not firing at anyone specifically," but merely firing randomly to facilitate his escape. (Doc. No. 13-26 at 8–9.) The TCCA determined this claim on *Strickland*'s prejudice prong, finding that Petitioner's argument was undone by a failure of proof at the post-conviction evidentiary hearing:

> Finally, the Petitioner contends that trial counsel was ineffective by failing to present a ballistics expert to corroborate the Petitioner's claim that he was not aiming at the victim but was firing his weapon at random in order to escape the store. However, the Petitioner did not have a ballistics expert to testify at the post-conviction hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit this witness might have offered to the Petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. *Id.* Accordingly, the Petitioner has failed to demonstrate prejudice in this regard.

*Pierce v. State*, 2018 WL 5793575, at *7.

This is not an unreasonable application of *Strickland*. Petitioner testified at the post-conviction evidentiary hearing that ballistics evidence might have supported his assertion (made by trial counsel in his closing argument (Doc. No. 13-25 at 617–18)) that he fired his weapon indiscriminately,[7] thus bolstering his defense that he lacked the intent required for an attempted

---

[7]     In response to his post-conviction counsel's questioning, Petitioner testified as follows about trial counsel's failure to develop ballistics evidence:

The other thing was: He never did no investigation as far as ballistics. All right. We seen in the video – all right. The DA made it clear saying that me and the victim had got to shooting at each other. But if he would have gotten a video specialist, he could – look at

homicide crime. But even if such ballistics evidence had been offered at the post-conviction evidentiary hearing, it cannot be said that proof of indiscriminate firing while fleeing the scene of a crime, had it been introduced by trial counsel, would have produced a substantial likelihood of a different result at trial, as required to establish prejudice under *Strickland*. *See Harrington*, 562 U.S. at 112 (finding that *Strickland* requires that counsel's error produce "likelihood of a different result" that is "substantial, not just conceivable"; concluding that state court could reasonably find lack of prejudice under *Strickland* where petitioner showed "nothing more than a theoretical possibility" that forensic proof would have bolstered defense). In any case, Petitioner's failure to make a record from which the post-conviction court could find prejudice dooms his ineffective-assistance claim. *See Troglin v. Westbrooks*, No. 1:12-CV-41, 2014 WL 5810312, at *11 (E.D. Tenn. Nov. 7, 2014) ("Given petitioner's failure to offer testimony at the post-conviction hearing to demonstrate prejudice flowed from the absence of expert testimony at trial, the state court did not unreasonably apply *Strickland* when it rejected this claim.") (citing *Martin v. Mitchell*, 280 F.3d 594, 608 (6th Cir. 2002) (ruling that petitioner did not show prejudice from failure to retain ballistics expert where he failed to establish "how the retention of experts . . . would have been beneficial to his defense")); *see also Hutchison v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002) ("Given the absence of proof at Hutchison's postconviction hearing, the state court's application of the *Strickland* test was not objectively unreasonable. This Court has held that a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of . . . how such evidence would have been material.") (citing, *e.g.*, *Martin*, *supra*). Petitioner is not entitled to habeas relief on this claim.

---

like where the bullet landed at and where the victim was standing at, it would have showed it. The bullet was nowhere near the victim, so how could I be shooting at the victim?

(Doc. No. 13-24 at 21.)

# V. CONCLUSION

For the foregoing reasons, the Petition will be **DENIED** and this action will be **DISMISSED** with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether Petitioner's claims should have been resolved differently or are deserving of encouragement to proceed further, the Court will **DENY** a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order is filed herewith.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

37